# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

<table>
<tr>
<td>

**In re**

**STEPHEN ANGELO,**

          **Debtor**

</td>
<td>

**Chapter 13**
**Case No. 09-22241-FJB**

</td>
</tr>
</table>

**MEMORANDUM OF DECISION ON**
**MOTION FOR RELIEF FROM JUDGMENT ON COMPLAINT FOR CIVIL CONTEMPT**

The chapter 13 debtor, Stephen Angelo ("Angelo"), has moved for an order vacating a judgment of contempt that was entered against him by the Massachusetts Probate and Family Court ("the "Probate Court") on a postpetition complaint by his ex-wife for enforcement of certain debts under their divorce judgment.  Angelo argues that vacatur is required because the contempt judgment was entered in violation of the automatic stay.  After an evidentiary hearing and for the reasons set forth below, the Court holds that the contempt judgment is void in part but otherwise enforceable.

**PROCEDURAL HISTORY**

On August 20, 2009, upon reconsideration of certain features of a 2004 judgment by which Angelo and Yevgeniya Robinson ("Robinson") were divorced, the Probate Court entered a Further Judgment of Divorce (the "Further Judgment").  In relevant part, the Further Judgment ordered Angelo to pay Robinson $7,500 and to pay her attorney, Robert F. Peck, Jr. ("Peck"), $37,252 for legal fees Robinson owed to Peck (the two awards together, the "Payment Obligations").

On December 18, 2009, Angelo filed a petition for relief under chapter 7 of the Bankruptcy Code, thereby commencing the present bankruptcy case.   On February 17, 2010, Angelo moved to convert his case to one under chapter 13 of the Bankruptcy Code, and the Court granted that motion on February 22, 2010.  The case remains open and in chapter 13.

On April 6, 2010, Peck, as counsel to Robinson, filed a complaint for civil contempt against Angelo in the Probate Court to enforce the Payment Obligations.  After two hearings, during which Angelo argued that the automatic stay prohibited the Probate Court from proceeding on the contempt complaint, the Probate Court determined that it was free to proceed and, on August 18, 2010, entered a judgment of contempt (the "Contempt Judgment").  The Contempt Judgment adjudged Angelo guilty of contempt, ordered that he pay a total of $53,898.68 to Robinson and Peck no later than September 20, 2010, committed him to jail for 60 days to compel such payment, and suspended this sentence until September 21, 2010, for performance review.

Five days later, Angelo, acting *pro se*, filed in the Bankruptcy Court the present motion, entitled Motion for Relief from Judgment on Complaint for Civil Contempt (the "Motion"), and asked that it be determined on an emergency basis.  The motion asks that the Bankruptcy Court vacate the Contempt Judgment on the basis that it was entered in contravention of the automatic stay, as set forth in 11 U.S.C. § 362(a)(6).  The Court held a preliminary hearing on the Motion on September 10, 2010.  Upon assurance from Peck that proceedings on the Contempt Judgment would not continue until after adjudication of the Motion, this Court scheduled and then held an evidentiary hearing on the Motion.  Approximately a week before the evidentiary hearing, Angelo, now acting through counsel, and Peck and Robinson, jointly represented by counsel of their own, filed trial briefs setting forth their respective positions in detail.  Angelo, Peck, and Robinson also filed a Joint Pretrial Memorandum that set forth certain agreed facts.

In his trial brief, Angelo argued for the first time that he should recover actual and punitive damages against Robinson and Peck under 11 U.S.C. § 362(k)(1).  However, the Motion itself does not request damages and does not directly request relief against Robinson and Peck.

The following constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a)(1), made applicable to this contested matter by Fed. R. Bankr. P. 9014(c).

**FINDINGS OF FACT**

    a.    **Marriage and Divorce**

Angelo and Yevgeniya Robinson ("Robinson"), a native of Ukraine, married in Ukraine in 1997.

They took up residence in the United States, had two children together, and moved to Massachusetts in

2001.  In August 2002, they had an argument that both contend caused an irretrievable breakdown of

the marriage.  On September 12, 2002, each filed a complaint in the Probate Court for divorce.  After a

two month separation, they reconciled and lived together until January 2004.

In late December 2003, they learned that Robinson's sister was very ill with kidney failure.

Angelo purchased a round-trip ticket to Ukraine for her to visit her sister and family, with a departure

date of January 2, 2004, and a return date of February 1, 2004.  On January 21, 2004, while she was

away, Angelo appeared *ex parte* in the Probate Court and obtained temporary sole physical and legal

custody of their children.  He did this without notice to Robinson.  To obtain this order, he told the

Probate Court, falsely and with intent to deceive, that Robinson had never taken care of the children or

been primarily responsible for them.  He did not indicate to the court that she was due to return from

the Ukraine in less than two weeks.

Also while she was away, he—without informing her, though they spoke at least weekly by

phone during this time—moved himself, the children, and all the families' belongings out of the marital

home to a new home, the location of which he did not tell her.  And he *did* tell her, during one of their

phone conversations in this period, that if she returned, he would kill her.  Despite this threat, she

returned on schedule to find their apartment empty and her family missing.  Now homeless with little

money, she spent the first night in a car.

With the help of her mother in Ukraine, she managed to return there.  Living with her mother,

she worked three jobs to earn money to return to the United States.  She also hired a Ukrainian

attorney, who instituted divorce proceedings there, worked with her toward regaining custody of the

children, and communicated with Angelo and his counsel in Massachusetts about the divorce

proceedings here.  While she was in Ukraine, Angelo went forward with his own divorce case against her

in the Probate Court; though he knew her correct address, he did not give her notice of the divorce

hearing and did not inform the Probate Court that, since entry of the earlier order awarding him

temporary custody, she had returned from Ukraine.  On September 7, 2004, after a hearing held that

same day that Robinson did not attend and was not aware of, the Probate Court entered a judgment of

divorce (the "Divorce Judgment") that awarded sole legal and physical custody of the children to Angelo.

Parallel divorce proceedings in Ukraine also resulted in a divorce and an award of custody to Robinson.

The Ukrainian divorce became final on December 3, 2004, the Massachusetts divorce on December 6,

2004.

> **b.      Reconsideration and Awards**

In June 2005, Robinson finally returned to Massachusetts and began efforts to contact the

children, to which Angelo responded with a further threat to kill her.  In November 2005, she moved in

the Probate Court for relief from various provisions of the Divorce Judgment.  On May 5, 2006 and after

an evidentiary hearing, the Probate Court, while allowing the divorce itself to stand, vacated all other

provisions of the Divorce Judgment.

The remaining issues in the divorce, primarily and especially custody and child support, were

tried over four days in early 2009.  Peck represented Robinson in the hearing.  The Probate Court had

appointed another attorney to represent the children, but Peck took the laboring oar on the custody

and child support issues.  The Court had also appointed a guardian ad litem to investigate and report on

child custody issues, and the guardian ad litem testified at the hearing.  Despite the presence and work

of these professionals appointed to represent the interests of the children, the vast majority of the time

that Peck expended at the evidentiary hearing was devoted to issues of custody and child support; Peck

testified credibly that other issues took no more than five percent of the trial time.  It appeared at the

time that neither party had significant assets to divide, so division of the marital estate was not an issue.

Neither was alimony an issue, Robinson having remarried in 2007.

On August 20, 2009, upon reconsideration of the Divorce Judgment, the Probate Court entered

a Further Judgment of Divorce (the "Further Judgment") and, in support thereof, issued extensive

findings of fact.  Among other things, the Further Judgment awarded sole legal and physical custody of

the children to Robinson, established visitation rights for Angelo, declared that neither party shall pay

alimony to the other, and ordered Angelo to pay child support of $654 per week and to provide health

insurance for the children.  Of particular relevance to the present controversy, the Further Judgment

also ordered Angelo to pay Robinson $7,500 (the "Robinson Award") and to pay her attorney, Peck,

$37,252 (the "Peck Award").  The Further Judgment obligated Angelo to pay both Awards within 120

days from the date of entry of judgment.

The Robinson Award is comprised of two components.  The first is compensation to Robinson

for Angelo's earlier disposal of her personalty, including but not limited to her clothing, watch collection,

cookbook collection, and doll collection.  The second is compensation to Robinson for a 2006 IRS levy on

her 2005 income tax refund.  Angelo was responsible for this levy because he had fraudulently filed a

joint federal income tax return without her authorization; in consequence, the IRS seized $1,100 of

Robinson's tax refund in partial satisfaction of Angelo's tax debt.

The Peck Award is for attorney's fees owed by Robinson to Peck for Peck's representation of

Robinson in the divorce and custody proceedings.  On April 23, 2009, Peck had submitted an affidavit to

the Probate Court in support of this fee award, attesting to total fees and costs of $56,212.97 for service

to Robinson since November 3, 2006.  With respect to Peck's fees, the judge's findings stated:

> The mother is without the financial resources to pay for all the legal fees
> and costs associated with these proceedings.  Counsel have submitted
> the issue of counsel fees on the pleadings, the court has reviewed the
> affidavit of counsel for [Robinson] and in consideration of the relevant

case law has provided for the defendant to pay the sum of $37,099[1]
towards the fees and costs she has incurred.

In support of the Further Judgment, the Probate Judge made extensive findings as to Angelo's credibility and motives, concluding that he is "not credible" and "has exhibited a pattern of deception throughout his life."  Among other things, she found:

- "Mr. Angelo identified himself as a graduate of the University of Phoenix on job applications when he has no such degree" and obtained his current job in this manner.

- "He earned significant sums while collecting unemployment and failed to report this."

- "He filed a joint tax return with Ms. Robinson without her permission or signature after they had separated and he had gone to Court for custody."

- "He created a false social security card and state identification under his pre-adoptive name[.]"

- "He led many of the professionals working with the children to believe Ms. Robinson had abandoned the children."

- "He misrepresented his knowledge of the whereabouts and schedule of the mother to obtain the custody order under false pretenses."

The Probate Judge also noted Angelo's "careful planning to all but omit [Robinson] from [the children's] lives."  She found that Robinson was "understandably and reasonably fearful of [Angelo], based on his conduct and threats toward her."

### c.        Angelo's Bankruptcy Filing

On December 18, 2009, the day by which the Robinson and Peck Awards were to be paid, Angelo filed a petition for relief under chapter 7 of the Bankruptcy Code, thereby commencing the present bankruptcy case.  With the petition, he filed schedules of creditors holding priority and nonpriority unsecured claims, which schedules he completed and signed under penalty of perjury.  On

---

[1] The discrepancy between this number, $37,099, and the amount specified in the Further Judgment as the Peck Award, $37,252, is unexplained.

these, he listed Peck and the Peck Award but deliberately omitted Robinson and her award.  He did not

schedule Robinson as a creditor in any capacity.[2]  Nor did he include her name on the creditor matrix

that he verified and filed in the case.  The matrix is a mandatory and formatted list of all creditors that

the court uses to give notice of the case to creditors.  As a result, Peck received prompt notice of the

bankruptcy case from the Court but, by Angelo's design, Robinson never did.  It is not clear when

Robinson herself received actual notice of the case.

When he received notice of the bankruptcy filing, Peck examined the schedules and statements

that Angelo had filed with the petition.  On his Schedule J, the schedule of current expenditures, Angelo

had listed a $500 monthly payment to "Geni Robinson," the nature of which was not otherwise

described.  This payment was in addition to a separately listed payment of $2,834 per month for child

support.

In January 2010, the month after his bankruptcy filing, Angelo commenced making payments to

Robinson on the Robinson Award.  These payments began in the amount of $50 per week; Angelo

reduced them to $40 per week in or about June 2010, and then, no later than August 2010, terminated

these payments altogether.  The parties agree that he presently owes her a principal balance of $6,140.

He never paid her $500 per month.  He testified that, when he completed Schedule J, he intended to pay

her $500 per month.  This testimony is not credible, belied by the fact that he never once paid her more

than $50 per week, which translates to $200 or $250 per month, and by the fact that he reiterated this

$500 per month figure on two amended versions of Schedule J that he filed in the case on February 17

and 28, 2010, notwithstanding that, as he himself testified, he was paying her much less than that when

---

[2] In addition, in his Statement of Financial Affairs at item 4, which required that he list all suits and administrative
proceedings to which the debtor is or was a party within one year immediately preceding the filing of his
bankruptcy case, he stated "none," deliberately omitting the Probate Court proceedings.  And on his Statistical
Summary of Certain Liabilities, which asked that he state the total amount of his divorce decree obligations not
reported on Schedule E, he stated "$0.00"  but should have reported the total of the Robinson and Peck Awards
and the sum that the Probate Court had ordered that he pay to the guardian ad litem.

the amended schedules were filed.[3]  Rather, he deliberately overstated this figure on Schedule J to

understate the extent of the disposable income available to him.[4]

Peck noted the monthly payment to Robinson on the original Schedule J and called Angelo's

bankruptcy counsel.  When he asked her whether Angelo agreed with his understanding that the Peck

Award was excepted from discharge, she indicated that, to the contrary, Angelo's position was that the

Peck Award was not excepted from discharge in bankruptcy.  But she did indicate to Peck that Angelo

did not dispute that, notwithstanding the bankruptcy, he would continue to owe the Robinson Award.

Among Angelo's assets at the time of his bankruptcy filing was an interest in an NSTAR pension

plan, a defined benefit plan.  On his schedule of personal property, he disclosed this asset and valued it

at $271,365.89; and on his schedule of property claimed as exempt, he claimed it as wholly exempt.  The

meeting of creditors was held and concluded on January 20, 2010; no objection to the claim of

exemption was filed within 30 days thereafter or at any time.

Peck noticed the pension plan in Angelo's Schedules B and C because he was familiar the

financial statements that Angelo had filed under penalty of perjury in the divorce proceedings since

2002, including one as late as August 2009.  On none of these had Angelo disclosed his interest in the

pension.  Angelo maintains that this was done without intent to deceive.  Initially, he maintains, he had

not disclosed them because his pension rights had not yet vested, and therefore they had no value;

then, in later iterations of the financial statement, he merely carried over the earlier information

without thought and without inquiry into the value.  In 2009, when he was preparing to file his

---

[3] In addition to the above payments to Robinson, in May, June, and August, 2010, Angelo also made payments of $250 to Peck on the Peck Award, for a total of $750.  In view of the dates and amounts of these payments, they cannot and do not account for the discrepancy between the $500 expense in Schedule J and the actual record of payments to Robinson.

[4] This conclusion is supported by the fact that Angelo made other misrepresentations for the same purpose.  On his Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, at line 5, he failed to disclose $2000 per month of rental income he was receiving during the relevant period.  He omitted the same rental income from his Statement of Financial Affairs at item 2, which required that he state the amount of income other than from employment or operation of business.  He stated "none."

bankruptcy petition, he was required to look anew at the question, and only at that point, he maintains,

did he determine that the pension had value.  This is his story.  It is not credible, in part because, upon

learning of the value of the asset, he still did not amend his disclosures in the divorce action or bring this

fact to the attention of Peck, Robinson, or the Probate Court.  Moreover, even by his own story, he knew

at all times that he had the asset; the only thing he didn't know was the value.  He was obligated to

disclose the asset, whatever its value and even if the value was uncertain or unknown.

###   d.        Conversion to Chapter 13

On February 1, 2010, the United States Trustee filed a statement in the bankruptcy case:  "The

United States Trustee has reviewed the materials filed by the debtor and has determined that the

debtor's case is presumed to be an abuse under [11 U.S.C. §] 707(b)."  The filing of such a statement in a

chapter 7 case is usually (if not invariably) an indication that the United States Trustee intends to move

to dismiss the case as abusive.  In response, on February 17, 2010, Angelo moved to convert his case to

one under chapter 13 of the Bankruptcy Code, and the Court granted that motion on February 22, 2010.

The case remains one under chapter 13.  Angelo did not serve the motion to convert on Robinson or on

Peck, and they received no notice of it.  With his motion to convert to chapter 13, Angelo filed a chapter

13 plan.  He did not serve the chapter 13 plan on Robinson, Peck, or any creditor.

###   e.        Peck's Adversary Proceeding

Just before Angelo moved to convert the case to chapter 13, Peck filed in the Bankruptcy Court

an adversary complaint against Angelo for a determination that the Peck Award is excepted from

discharge under § 523(a)(5) or § 523(a)(15) of the Bankruptcy Code.  On March 22, 2010, after

conversion of the case to chapter 13, Angelo, through counsel, filed an answer to the complaint.  The

answer was short:  "The Defendant, Stephen Angelo, does not object to the Plaintiff's claim that the

debt of $37,252.00 for attorney's fees awarded in the [Probate Court] to the Plaintiff is non-

dischargeable under the Bankruptcy Code." The answer included no responses to or denials of the

complaint's operative allegations of fact. On the same day as the answer was filed, the Court promptly

ascertained that the complaint stated a claim on which relief could be granted and, concluding that it

did, entered judgment for the Plaintiff as follows:

> The plaintiff, Robert F. Peck, Jr., having filed a complaint herein for
> a determination that the obligation of the defendant and debtor,
> Stephen Angelo, under a Probate and Family Court judgment of August
> 20, 2009, to pay the plaintiff's fees in the amount of $37,252.00 is
> excepted from discharge either under 11 U.S.C. § 523(a)(5) or under §
> 523(a)(15), and the debtor having answered that he does not object to
> plaintiff's claim that the debt is non-dischargeable, the Court hereby
> ORDERS, ADJUDGES, and DECLARES that the judgment debt is excepted
> from discharge.

### f.   The Contempt Complaint

On April 6, 2010, Peck, as counsel to Robinson and with her authorization, filed a complaint for

civil contempt against Angelo in the Probate Court to enforce the Payment Obligations (the "Contempt

Complaint"). The Contempt Complaint, filed in the name of Robinson alone, simply alleged that the

Further Judgment required Angelo to pay $7,500 to Robinson and $37,252 to Peck by December 20,

2009, that $6,900 and interest remained owing to Robinson, and that $37,252 and interest remained

owing to Peck; and, on the basis of these alleged facts, it requested that Angelo be ordered to show

cause why he should not be adjudged in contempt. The complaint did not expressly ask that

enforcement of the Payment Obligations be limited to specific assets or to assets that are not property

of his bankruptcy estate.

The Probate Court held a hearing on the Contempt Complaint on June 25, 2010.[5] It is not clear

whether Angelo filed an answer to the complaint prior to the hearing. It is clear, however, that Angelo

did not interpose the automatic stay as a defense to the complaint until, through his divorce counsel, he

did so orally, approximately half way through the June 25 hearing. The Probate Judge, expressing

---

[5] Transcripts of this hearing and the later hearing in the Probate Court were introduced into evidence.

dismay that the defense had not been raised in an answer or at least at the beginning of the hearing, suspended the hearing to require Angelo to properly raise the issue and to afford Robinson an opportunity to respond.  By agreement between Peck and Angelo's attorney, each side filed a brief in support of its position.

The hearing on the Contempt Complaint resumed on August 18, 2010.  At the hearing, the parties first addressed the automatic stay.  The focus of both parties' arguments was whether the Contempt Complaint fell within the exception set forth in 11 U.S.C. § 362(b)(2)(B) (the filing of a bankruptcy petition does not operate as a stay  "of the collection of a domestic support obligation from property that is not property of the estate").  Peck argued that it did, because the Payment Obligations were domestic support obligations that were being enforced against the pension fund, and the pension fund was not an asset of the bankruptcy estate.  Peck conceded that, because Angelo's postpetition earnings were property of his bankruptcy estate in chapter 13, Robinson could not proceed against them, but he argued that she could proceed against the pension.  Angelo argued that the Payment Obligations were not domestic support obligations, that the bankruptcy court's nondischargeability judgment as to the Peck Award was not preclusive on that issue, that Angelo's postpetition earnings were property of the bankruptcy estate, and that the pension, though not an asset of the estate, was also not a source from which payment could be had.  He also pointed out that the exception of the Peck Award from discharge did not mean that collection of that Award was not subject to the automatic stay. He did not argue that contempt process was not "collection" within the meaning of § 362(b)(2)(B).

When the argument was concluded, the Probate Judge, without articulating her reasoning on the record, indicated that she was satisfied that she could proceed on the Contempt Complaint.[6]  The second half of the hearing addressed the merits of the Complaint.  Angelo argued that he was unable to

---

[6] By way of explanation during the hearing, the judge said only:  "The Court notes that the bankruptcy judge, Judge Bailey, on 3/22/10 on the complaint that was filed by Mr. Peck looking for determination regarding the obligation of the defendant, the order is crystal clear in the Court's view, and the rest of it seems pretty clear to me as well."

liquidate or borrow against the pension funds prior to retiring or leaving his job and that he therefore

was unable to pay the Robinson and Peck Awards from that source.  At the conclusion of the hearing,

the Probate Judge entered judgment for Robinson, using a form of judgment that Peck had supplied and

amending the same with handwritten interlineations.  At the beginning of the Contempt Judgment, the

Probate Judge inserted the following prefatory clause:  "The complaint having proceeded based on the

analysis contained in the plaintiff's memorandum regarding the effect of the bankruptcy proceeding[.]"

The Contempt Judgment adjudged Angelo guilty of contempt, ordered that he pay a total of $53,898.68

to Robinson and Peck no later than September 20, 2012, committed him to jail for 60 days to compel

such payment, and suspended this sentence until September 21, 2010, for performance review.  It did

not specify that payment was payable only from the pension or direct that payment be made from

specific assets.  Five days later, on August 23, 2010, Angelo filed the present Motion in the Bankruptcy

Court.  Proceedings on the Contempt Judgment have essentially been stayed since the intitial hearing on

the Motion.

### g.    Damages

Angelo maintains that he suffered actual damages as a result of the contempt complaint and

judgment in the nature of (i) the attorney's fees and expenses he incurred in the contempt action, in an

appeal from the Contempt Judgment, and in bringing this motion for relief from the Contempt

Judgment, (ii) use of vacation and personal time in having to attend hearings in these matters, (iii)

transportation expenses incurred in attending hearings in these matters, (iv) the costs of hearing

transcripts, and (v) emotional distress.  The only evidence of damages that he submitted is his own

affidavit.  He contends that the first four items of damages presently total no less than $29,190.67 and

continue to accrue.  He has not itemized to any extent the components of the $29,190.67 and has

submitted no evidence to corroborate this sum or its component items:  no invoices, time records, or

testimony from his attorneys; no records of his use of vacation and personal time and no evidence from

his employer of the value of these; and no receipts or invoices with respect to transcripts and

transportation costs.  His record for credibility being what it is—his word cannot be trusted to any

extent—I attribute no truth value, no credibility, to his affidavit and therefore conclude that he has not

established damages in any definite amount.[7]

Angelo's affidavit also includes three paragraphs in which he attests to the emotional distress

that he associates with the contempt proceedings.  These averments, too, are not corroborated by other

evidence, such as from his employer, his girlfriend, or a mental health professional.  In view of his record

for credibility, I find his averments, especially standing alone, wholly lacking in credibility.  One averment

in particular stands out:  that "my belief in justice has been shattered."  The notion that he entered the

contempt proceedings with a preexisting "belief in justice" simply cannot be credited.  The evidentiary

record is a portrait of a man who, when it comes to belief in justice, honesty, and the rule of law, had

nothing to lose.  Moreover, he himself attributes much of his alleged distress to having his children

removed from his custody, to concerns about their present custodial arrangement, and to having to file

for bankruptcy relief; any distress caused by these events and concerns cannot fairly be attributed to the

contempt proceeding.  For these reasons, Angelo has not carried his burden of proving that he suffered

emotional distress as a result of the contempt proceedings.

**ARGUMENTS OF THE PARTIES**

Angelo argues that the Probate Court lacked subject-matter jurisdiction to decide whether the

automatic stay applied to the Contempt Complaint and did not actually decide the issue, but that even if

it did have jurisdiction and did decide the issue, the Bankruptcy Court may and must adjudicate that

---

[7] Below the Court concludes that the Contempt Judgment was a violation of the automatic stay only insofar as it
sought collection of a portion of the Robinson Award.  The balance of that Contempt Judgment, and the
proceedings to secure that balance, cannot be deemed violations of the stay.  Were it necessary to quantify
compensatory damages, Angelo would be entitled only to such damages as he would not have incurred in
defending that portion of the contempt proceedings that was not a violation of the stay.  Angelo has made no
attempt to do that or even to make it possible for the court to do so.

issue anew and is not precluded by the *Rooker-Feldman* doctrine from doing so.  He argues that the

Contempt Complaint and Contempt Judgment were violations of the automatic stay because they fail to

satisfy, as to both the Robinson and the Peck Awards, each of three requirements of the exception in §

362(b)(2)(B):  the Awards are not domestic support obligations, and the Peck nondischargeability

judgment is not preclusive on that issue; recovery is not limited to assets that are not property of the

estate; and contempt process differs from and exceeds the simple "collection" that § 362(b)(2)(B)

permits.  In view of this violation, Angelo contends, the Contempt Judgment is void, the Court must

award compensatory damages against Peck and Robinson, and the Court may and should award

punitive damages against both.  This is the substance of Angelo's argument.

 Robinson and Peck argue that the Probate Court had subject-matter jurisdiction to adjudicate

the applicability of the automatic stay, but they appear to agree with Angelo that the Bankruptcy Court

may and must adjudicate that issue anew.  On the merits, however, they maintain that the Probate

Court did adjudicate the issue and correctly ruled that the contempt action was excepted from the stay

by § 362(b)(2)(B).  They argue that the Peck Award is a domestic support obligation because it inures to

Robinson's benefit and was incurred in establishment of custody and child support; and they contend

that Peck's judgment of nondischargeability is in any event preclusive on that issue.  They argue that the

Robinson award, though not labeled alimony, is essentially in the nature of alimony and should be

treated as such.  And they contend that "collection" in § 362(b)(2)(B) encompasses contempt process

and that the Contempt Complaint and Contempt Judgment are and have been limited to recovery from

the pension.

**JURISDICTION AND BURDEN OF PROOF**

 In substance, the Motion seeks a declaration that the Contempt Judgment was entered in

violation of the automatic stay, 11 U.S.C. § 362(a), and therefore is void and ineffective.  The Motion

arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference,[8] referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1); the bankruptcy court accordingly has authority to enter a final order on the Motion.[9]  There exists an actual controversy warranting declaratory relief under 28 U.S.C. § 2201(a).

A party seeking to establish that a judgment was entered in violation of the automatic stay, 11 U.S.C. § 362(a), bears the burden of proof.  A party seeking damages under 11 U.S.C. § 362(k)(1) bears the burden of proving entitlement to damages.  In each instance, the standard is a preponderance of the evidence.

**DISCUSSION**

      **a.**        **No Preclusive Effect of State Court Judgment**

Angelo seeks a determination that the Contempt Judgment was entered in violation of the automatic stay, but, as Robinson and Peck point out, the Probate Court has already determined whether the automatic stay precluded entry of the Contempt Judgment.  Angelo interposed the automatic stay as a defense; and the Probate Court, in adjudicating the Contempt Complaint, actually addressed the applicability of the automatic stay to that Complaint and determined that the Probate Court was not stayed from adjudicating the Complaint on its merits.  The court then proceeded to decide the Complaint on its merits, and the ruling as to the applicability of the stay was necessary to the judgment. I am satisfied that the Probate Court had concurrent jurisdiction to rule on the applicability of the

---

[8] The order of reference is codified in the district court's local rules at L.R. 201, D. Mass.
[9] If and to the extent that the Motion may also be treated as one for damages under 11 U.S.C. § 362(k)(1), the same jurisdictional conclusions would also apply to the motion for damages.

automatic stay to the contempt proceeding[10] and that its judgment on that issue, as on the entire

Contempt Complaint, is final.[11]   In circumstances such as these, comity, the usual rules of issue

preclusion, and the *Rooker-Feldman* doctrine would normally require that the state court's ruling be

given preclusive effect.

Angelo argues that, notwithstanding the usual rules, the bankruptcy court, as the custodian of

the automatic stay and the court having exclusive jurisdiction of the bankruptcy case, must have the

final say over the applicability of the automatic stay and therefore must decide the issue anew.  Peck

and Robinson agree.  The Court, too, agrees that when faced with a collateral challenge to a state court

determination that the stay does not apply, the bankruptcy court having jurisdiction over a bankruptcy

case in which the stay arises must adjudicate the question anew. Though the issue is not wholly settled, I

agree with the cases that so hold[12] and will proceed to address the issue.

---

[10]  *In re Ivani*, 308 B.R. 132, 135-136 (Bankr. E.D.N.Y. 2004) (state and federal courts have concurrent jurisdiction to determine the applicability of the automatic stay).  I do not follow *Ivani* in its further conclusion that a federal court may not entertain a direct or collateral attack on a state court ruling on the applicability of the stay.

[11]  Angelo argues that because the Contempt Judgment suspended the sentence of incarceration until September 21, 2010 for compliance review, the Judgment is not final.  I disagree.  The suspension applies only to the incarceration, not to the judgment itself, as is made clear by the fact that the judgment required performance by September 20, 2010, and set up a review of compliance for September 21, 2010.  The Contempt Judgment was thus final and effective when entered.  Even if it was not, the suspension was temporary and would long ago have expired.

[12]  *In re Gruntz*, 202 F.3d 1074, 1083 (9th Cir.2000) (even if state courts have concurrent jurisdiction, the federal courts, by virtue of the power vested in them by Congress, have the final authority to determine the scope and applicability of the automatic stay; "[a] bankruptcy court simply does not conduct an improper appellate review of a state court when it enforces an automatic stay that issues from its own federal statutory authority"); *Chao v. Hosp. Staffing Services, Inc.*, 270 F.3d 374 (6th Cir. 2001) (when party seeks to commence or to continue proceedings in one court against debtor or his property, non-bankruptcy court properly responds to the filing by determining whether automatic stay applies but " if the non-bankruptcy court's initial jurisdictional determination is erroneous, parties run the risk that entire action later will be declared void *ab initio*"); *Raymark Indus., Inc. v. Lai*, 973 F.2d 1125, 1132 (3d Cir. 1992) ( bankruptcy court had the power to vacate the decision of state court dismissing appeal because actions taken in violation of the automatic stay are void *ab initio*); *In re Mid-City Parking, Inc.*, 332 B.R. 798, 802-04 (Bankr. N.D. Ill. 2005) (the best approach is that "nonbankruptcy forums in both the state and federal systems have jurisdiction to at least initially determine whether pending litigation is stayed pursuant to § 362," but "the bankruptcy court from which the automatic stay originated nonetheless has the final say"; "collateral challenges to a state court's automatic-stay determination are not forbidden by the *Rooker–Feldman* doctrine, because the bankruptcy court is viewed as enforcing its own injunction pursuant to the Supremacy Clause rather than conducting unauthorized appellate review of a state court order"); *In re Benalcazar*, 283 B.R. 514,  (Bankr. N.D. Ill. 2002) (*Rooker–Feldman* doctrine does not prevent bankruptcy court from

**b.      Automatic Stay and the § 362(b)(2)(B) Exception**

The "automatic stay" is set forth in 11 U.S.C. § 362(a) as not one stay but a collection of eight.  In

the Motion as in the Probate Court, Angelo invokes only part (6), under which the filing of a bankruptcy

petition "operates as a stay, applicable to all entities, of—any act to collect, assess, or recover a claim

against the debtor that arose before the commencement of the [bankruptcy] case."  11 U.S.C. §

362(a)(6).  The Robinson and Peck Awards are claims against the debtor that arose before the

commencement of the bankruptcy case, and the Contempt Judgment is an act to collect and recover

those claims.  Robinson and Peck do not disagree.  The Contempt Judgment is therefore subject to the

automatic stay unless it falls within one of the exceptions enumerated in § 362(b).

As they did in the Probate Court, Robinson and Peck argue that the Contempt Judgment is

wholly within the exception for "the collection of a domestic support obligation from property that is

not property of the estate."  11 U.S.C. § 362(b)(2)(B).  Angelo argues that the Contempt Judgment fails

to satisfy each of the exception's three requirements:  (i) the Awards are not domestic support

obligations; (ii) recovery is not limited to assets that are not property of the estate; and (iii) contempt

process is not "collection" within the meaning of § 362(b)(2)(B).  I will address each in turn.

**i.      Domestic Support Obligations**

"Domestic support obligation," as that term is used in § 362(b)(2)(B), is defined in § 101(14A) of

the Bankruptcy Code.  The definition's relevant parts, those that Peck and Robinson rely upon but that

Angelo contends are not satisfied, are two.  First, the obligation must be "owed to or recoverable by . . .

---

considering the question of whether the automatic stay applies to the contempt proceedings brought by against
debtor, because an erroneous decision by the state court as to the applicability of the automatic stay would result
in an order void ab initio under *Kalb v. Feuerstein*, 308 U.S. 433 (1940)); *In re Cavanaugh*, 271 B.R. 414, 424 (Bankr.
D. Mass. 2001) (because the automatic stay is an injunction issuing from the authority of the bankruptcy court,
bankruptcy court should determine whether that injunction was violated and protect it from collateral attack from
another forum).  *Contra In re Ivani*, 308 B.R. at 137 (where applicability of automatic stay was decided in state
court contempt proceeding, *Rooker–Feldman* doctrine bars any attempt by bankruptcy court to enforce the
automatic stay with respect to a contempt order).

a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible

relative." 11 U.S.C. § 101(14A)(A)(i). Angelo contends that the Peck Award does not satisfy this

requirement. Second, the obligation must be "in the nature of alimony, maintenance, or support . . . of

such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether

such debt is expressly so designated." 11 U.S.C. § 101(14A)(B). Angelo contends that neither Award

satisfies this requirement.

### A.    Peck Award

Robinson and Peck argue that the Bankruptcy Court's judgment on Peck's complaint for

determination of the dischargeability of the Peck Award preclusively establishes that that Award is a

domestic support obligation. The Court agrees. The preclusive effect of a federal judgment is

determined by federal law. *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995) and

authorities cited. "The principle of collateral estoppel, or issue preclusion, bars relitigation of any

factual or legal issue that was actually decided in previous litigation between the parties, whether on

the same or a different claim." *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994)

(internal quotations omitted).

> When there is an identity of the parties in subsequent actions, a party
> must establish four essential elements for a successful application of
> issue preclusion to the later action: (1) the issue sought to be precluded
> must be the same as that involved in the prior action; (2) the issue must
> have been actually litigated; (3) the issue must have been determined
> by a valid and binding final judgment; and (4) the determination of the
> issue must have been essential to the judgment.

*Id.* Each of the requirements is satisfied here. Each party to the dischargeability action is a party to this

Motion, Angelo as movant and Peck as a respondent defending the Contempt Judgment as to the Peck

Award. The dischargeability action was determined by a valid and binding judgment. The issue decided

in that action, whether the Peck Award is a domestic support obligation as that term is defined and used

in the Bankruptcy Code, is the same as the issue sought to be precluded here; "domestic support

18

obligation" is defined in § 101(14A) and therefore has the same meaning in § 523(a)(5) as it does in §

362(b)(2)(B).  And the issue was actually litigated, judgment having entered on the pleadings.

This leaves only the question of whether the determination was necessary to the judgment.

Angelo disputes that it was.  He argues that the nondischargeability complaint sought a determination

on two grounds, § 523(a)(5) and § 523(a)(15), which are mutually exclusive, the former being for

domestic support obligations and the latter being for certain debts to a spouse of the debtor "not of the

kind described in paragraph (5)."  11 U.S.C. § 523(a)(15).  Angelo answered that he did not dispute that

the debt is excepted from discharge, but he did so without admitting that it was an (a)(5) debt or an

(a)(15) debt, only that it was one or the other.  The answer did not specify which it was; nor did the

judgment, at least not expressly.

This argument is correct as far as it goes, but it goes not far enough.  There is an additional

relevant fact:  when Angelo answered the complaint and the court entered judgment, his bankruptcy

case had been converted to one under chapter 13.  In chapter 13, a debt of the kind described in §

523(a)(15) is *not* excepted from discharge.[13]  11 U.S.C. § 1328(a) (defining scope of chapter 13

discharge).  The count under § 523(a)(15) therefore failed to state a claim on which relief could be

granted, and the determination of the count under § 523(a)(5) was necessary to the judgment. The

judgment therefore preclusively established that the Peck Award is, in its entirety, a domestic support

obligation.[14]

---

[13]  The rule is different when the chapter 13 discharge enters under § 1328(b), a so-called "hardship discharge,"
instead of under § 1328(a), which is the usual and default option in chapter 13.  Angelo has not contended that he
is entitled to a hardship discharge.

[14]  Were I to address the issue anew on the record before me, I would reach the same result.  Peck's fees were
incurred in Robinson's litigation of custody and child support issues, which consumed 95 percent of the trial time—
and, I infer, of Peck's billable hours in and out of court.  A fraction, perhaps 40 percent, of the small balance of his
time and fees were attributable to the portion of the Robinson Award that is a domestic support obligation.  And
the fee award was made precisely because, as the Probate Court found, Robinson "is without the financial
resources to pay for all the legal fees and costs associated with these proceedings."  On these facts, the Peck
award is actually in the nature of support, both child and spousal.  *Macy v. Macy (In re Macy)*, 192 B.R. 802, 806
(Bankr. D. Mass. 1996), *aff'd*, 114 F.3d 1 (1st Cir. 1997); *In re Michaels*, 157 B.R. 190, 192-93 (Bankr. D. Mass. 1993).
The fact that it is payable to Peck does not disqualify it from being a domestic support obligation.  Each dollar paid

### B.    Robinson Award

The Robinson Award is not the subject of a preclusive ruling.  In order to qualify as a domestic

support obligation, an obligation must be "in the nature of alimony, maintenance, or support . . .

without regard to whether such debt is expressly so designated." 11 U.S.C. § 101(14A)(B).  Robinson

contends that the Award qualifies because it is in the nature support.  Angelo contends that no part of

the Award is support.

Whether a particular obligation under a divorce judgment is in the nature of support is a

question of federal bankruptcy law.  *In re Michaels*, 157 B.R. at 193.  It depends not on the label

attached to the obligation but on the purpose it was intended to serve by the court that fashioned it.

*Id.*; 11 U.S.C. § 101(14A)(B) (specifying that debt must be in the nature of support "without regard to

whether such debt is expressly so designated"). To discern this intent, courts examine three principal

indicators:  (1) the language and substance of the state court's order; (2) the parties' financial

circumstances at the time of the order; and (3) the function served by the obligation at the time of the

order. *In re Soforenko*, 203 B.R. 853, 859 (Bankr. D. Mass. 1997) and cases cited; *In re Michaels*, 157 B.R.

at 193; *Macy v. Macy (In re Macy)*, 192 B.R. 802, 806 (Bankr. D. Mass. 1996), *aff'd*, 114 F.3d 1 (1st Cir.

1997).

The $7,500 Robinson Award is comprised of two quantified parts.  The first, in the amount of

$1100, is to compensate Robinson for damage caused to her, in the nature of lost income, when the IRS

levied on her income tax refund to pay Angelo's tax arrearage, all because Angelo had filed a joint

federal income tax return without her authorization.  The second part, for the $6,400 balance, is

compensation to Robinson for Angelo's earlier disposal of her personalty, including but not limited to

---

on the Peck Award satisfies a dollar of Robinson's obligation to Peck.  The award entered in a divorce proceeding
to which Robinson but not Peck was a party, and the Contempt Judgment for its nonpayment was entered on a
complaint brought in her name, not Peck's.  Therefore it is in an obligation for the benefit of Robinson, and
payments on it to him are, in effect, payments to her.  The Award is therefore "owed to and recoverable by"
Robinson within the meaning of the definition of domestic support obligation, at 11 U.S.C. § 101(14A)(A)(i).

her clothing, watch collection, cookbook collection, and doll collection.  Robinson contends that both

parts are support because these items represent necessities and funds that should have been available

for Robinson's personal needs and support.

The Court is satisfied that the tax refund and the clothing were necessities and should have

been available for Robinson's support.  The Probate Award was intended to replace them, to supply

needs.  This, in combination with the Probate Court's finding that Robinson lacked the financial

resources to pay her legal fees in full, suggests that the award for these items was not simply an award

for past damage to property interests but a replacement of necessities that served, and was intended to

serve, the purpose of support.  A lump sum award, even when not labeled alimony or support, can

nonetheless serve a support purpose and constitute support.  That is the case here.  However, the

evidence, including the transcript of the 2009 trial in the Probate Court, does not support the conclusion

that the watch, cookbook, and doll collections were necessities or served a support purpose.[15]

Accordingly, the Court concludes that the Robinson Award was a domestic support obligation to the

extent that it constituted compensation for Robinson's tax refund ($1,100) and clothing (an unspecified

portion of the remaining $6,400).  The remainder is not a domestic support obligation.

### ii.        Property of the Estate

Angelo next argues that the Contempt Judgment is not within the exception for "the collection

of a domestic support obligation from property that is not property of the estate" because, for three

reasons, the recovery is not limited to assets that are not property of the estate.  First, by its nature, civil

contempt is directed not at property but at the contemnor.  Second, nothing in the Contempt Judgment

indicates that the satisfaction it requires is limited to liquidation or turnover of property that was not

property of the estate.  Third, insofar as Peck and Robinson may contend that satisfaction is implicitly

---

[15] I am mindful that the Probate Judge, who fashioned the obligation in the first place, concluded otherwise.
However, she did not issue findings and rulings in support of her conclusion, and I must in any event decide the
issue anew.

limited to recourse against his pension rights, because a qualified domestic relations order ("QDRO") has not been sought and, at least as to the attorney's fees, cannot be obtained.  These are Angelo's arguments.  Peck and Robinson respond that the Contempt Judgment is implicitly limited to recourse against Angelo's pension rights, as evidenced by the fact that the Probate Judge expressly endorsed the reasoning of Peck's memorandum on the automatic stay issue, where Peck expressly invoked the § 362(b)(2)(B) exception as the basis for his and Robinson's right to proceed against Angelo's retirement benefits.

The Court agrees that the Contempt Judgment need not and should not be construed to authorize collection from any source other than Angelo's pension rights.  In the Contempt Judgment itself, the Probate Judge expressly adopted "the analysis contained in the Plaintiff's memorandum regarding the effect of the bankruptcy proceeding."  There, Peck had invoked the § 362(b)(2)(B) exception as the basis for his and Robinson's right to proceed against Angelo's retirement benefits, and he had further acknowledged that postpetition earnings, on the other hand, *were* property of the estate and, he clearly implied, subject to the stay.  Therefore, notwithstanding the lack of express restriction to Angelo's retirement benefits in the Contempt Judgment, I find that the Probate Court was aware of that limitation in § 362(b)(2)(B) and intended that the judgment be so limited.  If the judgment were wider in scope, it would be void to the extent that it authorized recourse or collection from estate assets.

Angelo's other arguments are unavailing.  Provided the goal is to reach a non-estate asset, such as the pension rights here or postpetition earnings in a chapter 7 case, I do not understand § 362(b)(2)(B) to bar employment of contempt or any other mechanism to aid in the reaching of the asset.  And Angelo's argument regarding the necessity and availability of a QDRO is properly addressed to the state courts.

### iii.    "Collection"

Last, Angelo argues that the Contempt Judgment is not removed from the scope of the automatic stay by § 362(b)(2)(B) because that exception applies only to "collection," which he contends means nothing more than "receiving payment" and does not include contempt process; Angelo argues that, in the language of § 362(a) and (b), contempt process is properly classified as "enforcement," and that there can be no overlap between collection and enforcement.  There are no cases on the issue in this Circuit and few cases on it anywhere.  Angelo's principal authority is a treatise whose treatment of the issue was examined and rejected by the only court to have fully examined the issue, *In re Johnston*, 321 B.R. 262, 275-78 (D.Ariz. 2005) ("collection" includes proceedings to enforce alimony or support orders).  For the reasons articulated in Johnston and those further elaborated below, the Court rejects Angelo's argument as inconsistent with the plain meaning of "collection," with the structure of the automatic stay, § 362(a) and (b), and with the rules that govern its construction.

The automatic stay is set forth and defined in subsections (a) and (b) of § 362 of the Bankruptcy Code, 11 U.S.C. § 362(a) and (b).  Its scope is defined in two stages:  first subsection (a) puts in place a comprehensive stay, then subsection (b) carves out from it some 28 enumerated exceptions.  *See* 11 U.S.C. § 362(a) & (b).  The exception in question applies to "the collection" of a domestic support obligation.  11 U.S.C. § 362(b)(2)(B).  This exception is the only instance in which the word "collection" is used in subsection (b).  Although "collection" as such does not appear in subsection (a), a variant of collection appears in part (6) subsection (a), which, in relevant part, stays "any act to collect . . . a claim against the debtor that arose before the commencement of the case under this title."  11 U.S.C. § 362(a)(6).  Angelo contends that "collection" must be distinguished from "any act to collect," but he does not explain how or why.  I am satisfied that if "collection" is not co-extensive with the universe of

all "acts to collect," it is at least a subset of those acts.[16]  "Enforcement" appears once in subsection (a): at part (2), which stays "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title."  11 U.S.C. § 362(a)(2).  It also appears several times in subsection (b):  at § 362(b)(2)(G) (exception for enforcement of certain medical obligations), § 362(b)(20) (exception for any act to enforce certain liens), § 362(b)(21) (same), and § 362(b)(25)(B) (exception for enforcement of certain orders or decisions of a securities self regulatory organization).  Neither "collection" nor "enforcement" is defined in the Bankruptcy Code.

The usual and ordinary meaning of "collect" and "collection," as these apply to debts, includes not only simple receipt of payment but also the obtaining of payment by legal proceedings.  "To collect a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or legal proceedings."  Black's Law Dictionary, p. 263 (6th ed. 1990) (definition of "collect").  Accordingly, collection is a term of very broad applicability, encompassing the employment both of legal process, to its full extent, and of the full range of informal means that are available to a creditor to obtain payment of a debt.  Accordingly, Professor Charles Tabb characterizes the "any act to collect" provision in § 362(a)(6) as a catch-all.  Charles Jordan Tabb, *The Law of Bankruptcy*, p. 252, 271-273 (2d ed. 2009) ("Finally, a catch-all provision, subsection (6), stays 'any act' to collect a prepetition claim.").  Indeed Tabb reads § 362(a)(6) as demonstrating "[t]he intention of Congress to implement a pervasive stay against all conceivable creditor collection efforts."  The notion that "collection" and "to collect" are somehow limited to the passive act of receiving payment is not at all warranted by its ordinary usage.  A wholly passive construction would render useless the term "collection attorney," a fixture in the debt collection world; creditors don't employ attorneys just to receive payment on their behalf.  So the obtaining of payment by legal process is well within the established and ordinary use of "collection."  *In re Johnston*, 321 B.R. at 276-78 (the plain meaning of collection encompasses a proceeding to collect).

---

[16] I am aware of no cases addressing the relationship between "collection" in § 362(b)(2)(B) and "any act to collect" in § 362(a)(6).

Angelo responds that whatever its ordinary usage, "collection" cannot be construed to include "enforcement" because, as a general rule of construction, Congress must have intended for the words "collection" and "enforcement" to have not only different meanings but meanings that do not overlap. The theory informing this argument is that the various terms and phrases that describe what is stayed and not stayed by the automatic stay must be construed not to overlap at all, notwithstanding that in ordinary usage they overlap considerably and that collection, in common and ordinary usage, includes the obtaining of payment by legal process, precisely what Angelo is calling "enforcement." This is a misreading of the automatic stay in general and of "collection" in particular.

The automatic stay is defined in the first instance by subsection (a) of § 362.[17] The clear purpose of subsection (a) is to put in place a broad and comprehensive stay, one without gaps. To that end, it is

---

[17] Subsection (a) of 11 U.S.C. § 362 states:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

comprised not of a single stay but of eight, arrayed in paragraphs (a)(1) through (a)(8), most of which

are themselves comprised of multiple stays.[18] Among the numerous stays that together constitute the

automatic stay there exists considerable overlap.  For example, a postjudgment proceeding to enforce

against property of the bankruptcy estate a prepetition judgment on a claim against the debtor would

be enjoined by paragraphs (1), (2), (3), and (6).  If the property in question were subject to a prepetition

judicial lien, the same action would also be enjoined by paragraphs (5) and (6).  This overlap is

intentional, born of the legislative intent to leave no gap in coverage, to let no creditor effort "fall

between the chairs."  It was manifestly not the intent of the drafters for the numerous stays that

constitute § 362(a) to respect each other's boundaries and have no overlap, and no rule of

interpretation that dictated otherwise would be appropriate to this subsection.

Nor can Angelo argue that the exception for "collection" in § 362(b)(2)(B) at best nullifies only

the stay of "any act to collect" in § 362(a)(6), such that the stays in  § 362(a)(1) and (2) continue to

apply.  In relevant part, § 362(b)(2)(B) states:   "The filing of a petition . . . does not operate as a stay

*under subsection (a)* of the collection of a domestic support obligation from property that is not

property of the estate."  11 U.S.C. § 362(b)(2)(B) (emphasis added).  The emphasized words mean that, if

the conduct in question is "collection" that qualifies for the exception, it is excepted from the

application of all of subsection (a) and therefore from any part of the automatic stay that may otherwise

---

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

[18] See paragraphs (1)-(6) of 11 U.S.C. § 362(a).

apply to the conduct.[19]  Accordingly, "collection" activity is excepted from the stay of enforcement of

prepetition judgments in part (2), the stay of the continuation of judicial proceedings in part (1), and the

stay of "any act to collect, assess, or recover a claim" in part (6).  *See* 11 U.S.C. § 362(a)(1), (2), and (6).

Moreover, the emphasized language is further evidence that Congress understands "collection" to

include conduct that is enjoined in parts (1) through (5) of subsection (a).  Were this not so, the

emphasized language would not have needed its full breadth and would simply have said "under

subsection (a)(6)."  For these reasons, I hold that Congress understood "collection" to include

enforcement of a judgment by contempt and that, in § 362(b)(2)(B), Congress created an exception from

the entirety of the stay to permit that to occur.

The cases that Angelo has cited do not require a different conclusion.  In *In re Gresham*, 2008

Bankr. LEXIS 2538, *6-7 (Bankr. N.D. Ga. 2008), the court held, unremarkably, that § 362(a) stays state

court contempt proceedings that are intended to compel a debtor to pay a domestic support obligation

or any other obligation arising from a divorce decree.  The court further held that the exception in §

362(b)(2)(B) did not apply because the creditor was trying to reach postpetition earnings, which were

property of the estate.  The Court did not address the meaning and scope of "collection" in §

362(b)(2)(B) or hold that the stay would apply if collection were from assets that are not property of the

estate.

In *Brooks v. Brooks (In re Brooks)*, 2007 Bankr. LEXIS 552, *10-11 (Bankr. E.D. Tenn. 2007), the

court did hold that the employment of contempt process to enforce an alimony award is a violation of

the automatic stay.  In doing so, however, the court held, without explanation or support, that the

exception in § 362(b)(2)(B) "does not extend to the 'commencement or continuation of an action or

proceeding' to enforce an obligation"; that is, the court held that conduct within the scope of §

---

[19] By way of contrast, some of the exceptions in subsection (b) do not extend to all parts of the automatic stay.
See 11 U.S.C. § 362(b)(4) ("does not operate as a stay under paragraph (1), (2), (3), or (6) of subsection (a) of this
section"), (b)(22) ("does not operate as a stay . . . under subsection (a)(3)"), and (b)(23) (same).

362(b)(2)(B) is not excepted from § 362(a)(1) (staying the continuation of judicial proceedings).  *Id.*,

citing *Lori v. Lori (In re Lori)*, 241 B.R. 353, 355 (Bankr. M.D. Pa. 1999) (quoting 3 *Collier on Bankruptcy* ¶

362.05[2], at 362-51 (15th ed. rev. 1999).[20]  This holding cannot be reconciled with the statutory words I

emphasized above, which make § 362(b)(2)(B) an exception from *all* parts of the automatic stay.

Accordingly, I decline to follow *Brooks* and *Lori* on this issue.  I cannot discern from either *Brooks* or *Lori*

why *Collier on Bankruptcy* reasoned as it did in 1999.  However, *Collier on Bankruptcy* today does not

construe the present version of § 362(b)(2)(B) as it did the earlier version back in 1999.  3 *Collier on*

*Bankruptcy* ¶ 362.05[2], at 362-57 (16th ed. rev. 2012) ("[s]ection 362(b)(2)(B) . . . did not authorize,

*prior to the 2005 amendments*, enforcement litigation against the debtor without relief from automatic

stay" (emphasis added)).

Angelo's principal support is another Collier treatise, which takes the following position:

> Unless the word "collection" is interpreted to encompass the continuation of a proceeding for the purpose of collecting, a proceeding to enforce an earlier support or alimony order or agreement is barred by the automatic stay.  Since other exceptions to the stay specifically speak of enforcement of judgments, it is unlikely that such an interpretation was intended. . . .  And the 2005 amendments, while permitting the withholding of income pursuant to a judicial or administrative order or statute, as well as various other specific enforcement steps such as tax intercepts, suspension of licenses, and reporting to consumer reporting agencies, also did not create a general exception for enforcement of domestic support obligations or for the commencement or continuation of a proceeding to enforce domestic support obligations.  Indeed, Congress used the word enforcement specifically in new section 362(b)(2)(G), relating to medical obligations, which suggests that the failure to broadly permit all other support enforcement was intentional.

---

[20] Section 362(b)(2)(B) was given its present form with passage of the Bankruptcy Abuse Protection and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 § 214 (April 20, 2005), which became effective October 17, 2005.  Prior to that date, and as construed in the *Lori* case, the exception protected "the collection of alimony, maintenance, or support from property that is not property of the estate."  The 2005 amendment does not appear to have affected the use or meaning of "collection" in this exception.

Sommer & McGarity, *Collier Family Law and the Bankruptcy Code*, ¶ 5.03[3][b][iii] (Lexis Nexis ed. 2010)

("*Collier Family Law*").[21]  This argument, too, does not address the deliberately broad scope of

"collection" and the fact that, as written, § 362(b)(2)(B) clearly excepts "collection" from all parts of the

stay.  Contrary to the first quoted sentence, "collection" *does* encompass continuation of a proceeding

for the purpose of collecting.  The fact that Congress used not only the word "collection" but also

"enforcement" and "the continuation of a proceeding to recover a claim" for certain purposes hardly

means that "collection" cannot include the other two.  In § 362(b)(2)(B), Congress deliberately used the

broader, all-inclusive term.  Accordingly, the position of *Collier Family Law* was rejected by the only

court to have examined it in depth.  *In re Johnston*, 321 B.R. at 275-78 ("collection" includes proceedings

to enforce support orders).  I, too, find *Collier Family Law* unpersuasive[22] and hold that "collection"

includes enforcement by contempt process.

> iv.    **Conclusion Regarding Scope of Stay**

For the reasons set forth above, the Contempt Judgment is not subject to the automatic stay

except to the extent that it would enforce Robinson's right to damages for her watch, cookbook, and

doll collections, for an unquantified portion of $6,400.00.  To this extent only, the Contempt Judgment is

void and unenforceable.  The remainder of the Contempt Judgment is not subject to the automatic stay;

the stay does not enjoin its enforcement.

> c.    **Damages**

> (i)    **Lack of Proper Motion**

Though Angelo's motion seeks only a determination of the validity and enforceability of the

Contempt Judgment, his counsel included in her prehearing memorandum an argument for an award of

---

[21] *Collier Family Law* cites no authority for its position other than *Lori*, which itself is based on *Collier Family Law*.
[22] In addition to *Brooks* and *Lori*, I have found only one other case that holds as they do, *In re Jenkins*, 2011 WL 2619317, *9-10 (Bankr. N.D.N.Y. 2011).  *Jenkins* simply follows *Collier Family Law* without elaboration.

damages against Robinson and Peck under 11 U.S.C. § 362(k).  The brief was filed and circulated eight

days in advance of the evidentiary hearing.  At the evidentiary hearing, Angelo adduced evidence in

support of a damages award.  Robinson and Peck have at no point voiced objection to treatment of the

present motion as including a demand for damages.  Accordingly, the Court will entertain the request

for damages as part of the pending motion.

### (ii)      Positions of the Parties

Section 362(k)(1) states that, subject to exceptions not applicable here, "an individual injured by

any willful violation of a stay provided by this section shall recover actual damages, including costs and

attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. §

362(k)(1).  Angelo seeks five categories of compensatory damages, outlined above in the findings of fact

regarding damages, and punitive damages. The conduct that would form the basis of the award is Peck's

and Robinson's prosecution of the Contempt Complaint and enforcement of the Contempt Judgment.

Given the manner in which the request for damages was asserted, Robinson's and Peck's

opportunity to respond and defend has been somewhat compromised.  Briefing was completed before

the damages issue was first raised.  Nonetheless, I discern in the arguments of their counsel, and in her

presentation of evidence, at least three defenses.  First, they deny that the employment of contempt

process was subject to the automatic stay; on that issue I have determined that they are correct as to

most but not all of the debt at issue.  Second, they question Angelo's credibility at every turn; in that

vein, I have already found a wholesale failure to prove actual damages.  Third, they argue that Angelo is

estopped from invoking any provision of the Bankruptcy Code against Robinson, the true creditor on

both the Robinson and Peck Awards, where, deliberately and in bad faith, he omitted her and her debts

from his schedules, omitted her from the matrix and from notice of the case, told her (when Peck

inquired of his attorney) that her award would be unaffected by it, gave her no notice of his motion to

convert the case to chapter 13 and his chapter 13 plan, lied under oath in numerous places in this case

in ways that would affect the viability of the bankruptcy filing and the treatment of her debt in chapter

13, and generally has prosecuted the case in bad faith as to her.

### (iii)   Judicial Estoppel

In content though not in form, this third argument is one of judicial estoppel, a threshold issue.

Angelo does not deny the factual allegations that form its basis.  He disputes only its relevance.

Acknowledging that parts of the record paint Angelo "in a very unfavorable light," his attorney said:

"We are here to address the automatic stay, and that automatic stay applies to the good, the bad, and

the ugly with equal force.  It applies to Mr. Angelo."  I understand Angelo's position to be that, however

dishonest and abusive he may have been in his schedules and in the conduct of this bankruptcy case vis-

à-vis Robinson, he was at all times entitled to the benefits of the automatic stay, and he is now entitled

to full benefit of § 362(k)(1) (permitting an individual injured by a violation of the stay to recover

damages) against her.  For the reasons that follow, I agree that even the ugly enjoy the benefit of the

stay, but I conclude that, in view of Angelo's conduct in this case, he may be estopped from invoking §

362(k)(1) to seek redress.

The First Circuit Court of Appeals has summarized the doctrine of judicial estoppel as follows:

> The equitable doctrine of judicial estoppel is ordinarily applied to
> prevent[] a litigant from pressing a claim that is inconsistent with a
> position taken by that litigant either in a prior legal proceeding or in an
> earlier phase of the same legal proceeding."  Where one succeeds in
> asserting a certain position in a legal proceeding, one may not assume a
> contrary position in a subsequent proceeding simply because one's
> interests have changed.  We have explained that, "[t]he doctrine's
> primary utility is to safeguard the integrity of the courts by preventing
> parties from improperly manipulating the machinery of the justice
> system."

*Guay v. Burack*, 677 F.3d 10, 16 (1st Cir. 2012) (internal citations omitted).  "In line with this prophylactic

purpose, courts typically invoke judicial estoppel when a litigant is 'playing fast and loose with the

courts.'"  *Alternative Sys. Concepts*, 374 F.3d 23, 33 (1st Cir. 2004).

Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is

invoked by a court at its discretion.  *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 1815

(2001).  "The contours of the doctrine are hazy, and there is no mechanical test for determining its

applicability."  *Alternative Sys. Concepts*, 374 F.3d at 33.

> It is, however, widely agreed that, at a minimum, two conditions must
> be satisfied before judicial estoppel can attach.  First, the estopping
> position and the estopped position must be directly inconsistent, that is,
> mutually exclusive.  Second, the responsible party must have succeeded
> in persuading a court to accept its prior position.  The presence of these
> elements creates the appearance that either the first court has been
> misled or the second court will be misled, thus raising the specter of
> inconsistent determinations and endangering the integrity of the
> judicial process.

*Id*. (internal citations omitted).  The First Circuit further elaborated on the role of the benefit, if any, that

the party to be estopped derived or will derive from its inconsistency:

> While it is not a formal element of a claim of judicial estoppel, courts
> frequently consider a third factor:  absent an estoppel, would the party
> asserting the inconsistent position derive an unfair advantage?
> Relatedly, courts often inquire as to whether judicial acceptance of a
> party's initial position conferred a benefit on that party.  Judicial
> acceptance and partisan benefit normally are two sides of the same coin
> (after all, it is unlikely that a party will advance a particular position
> unless that position benefits its cause).  To the extent that there is a
> separation, however, it is the court's acceptance of the party's
> argument, not the benefit flowing from the acceptance, that primarily
> implicates judicial integrity.  Thus, benefit is not a sine qua non to the
> applicability of judicial estoppel.

Id. (internal citations omitted).

It is well-established that judicial estoppel may be invoked where a debtor made a

representation in his bankruptcy schedules and then articulated a contrary position in litigation.  Usually

the misrepresentation is the debtor's omission of a cause of action from his or her schedule of assets,

followed by the debtor's attempt to prosecute that cause of action in later proceedings after the case is

closed.  *See, for example*, *Guay v. Burack*, 677 F.3d at 17 (affirming dismissal of claims debtor had failed

to schedule, and noting  that "it is well established that a failure to identify a claim as an asset of a

bankruptcy proceeding is a prior inconsistent position that may serve as the basis for application of judicial estoppel"), and *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir.1993) ("[H]aving obtained judicial [bankruptcy] relief on the representation that no claims existed, [plaintiff] cannot now resurrect them and obtain relief on the opposite basis.").

I turn now to the facts of this case, beginning with the first of the two requirements of judicial estoppel:  the estopping position and the estopped position must be directly inconsistent, mutually exclusive.  That requirement is clearly satisfied here.  When Angelo filed his bankruptcy petition, he was obligated to file, under oath, schedules identifying his creditors and the debts he owed them.  In the schedules he filed under oath, he deliberately omitted Robinson and the debt he owes her.  These schedules were meant to define the universe of debts as to which he was seeking the relief that bankruptcy affords, including the protection of the automatic stay.  Angelo also omitted Robinson's name from the creditor matrix that he filed in the case, making his verification of that matrix both false and fraudulent.  His omissions were neither innocent oversights nor the result of excusable neglect but part of a thoroughgoing pattern of deception and exclusion in this bankruptcy case.  Nor did Angelo ever correct them.  To the contrary, when he later moved to convert his case to chapter 13 and filed a chapter 13 plan, he gave her no notice of either the motion or the plan.  The position he took in his schedules and matrix is that Robinson is not a creditor affected by this bankruptcy filing.  The position he takes in the present motion for damages is that he owed her a debt and that the debt was affected by his bankruptcy filing, at least insofar as its enforcement has been subject from the start to the automatic stay.  The estopping position and the position to be estopped are thus directly contradictory.

The second requirement of judicial estoppel is that the responsible party must have succeeded in persuading a court to accept its prior position.  In general, this has required an affirmative showing, by competent evidence or inescapable inference, that the court somehow actually relied upon or accepted the prior inconsistent assertion.  *Perry v. Blum*, 629 F.3d 1, 11-12 (1st Cir. 2010).  In bankruptcy, where

33

relief is often conferred either automatically (as with the *automatic* stay) or by default (as with a chapter 7 discharge, when no one objects to discharge), this requirement has functioned less stringently in its application to debtors who have played fast and loose with the courts.  "A bankruptcy court 'accepts' a position taken in the form of omissions from bankruptcy schedules when it grants the debtor relief, such as discharge, on the basis of those filings."  *Guay v. Burack*, 677 F.3d at 18 (where debtor had omitted a claim from his schedules, acceptance was deemed established by the fact of his having received a discharge).  Notably, in *Guay v. Burack*, the bankruptcy court had not actually relied on the debtor's representation either in awarding the discharge or in fending off an objection to discharge.  Rather, the discharge had entered when the case was in chapter 7.  In chapter 7, a debtor usually receives a discharge by default; discharge will enter unless an objection to discharge is filed and sustained.  11 U.S.C. § 727(a) ("The Court shall grant the debtor a discharge, unless . . . .").  The recitation of facts in *Guay* gives no indication that an objection to discharge had been filed or that any actual litigation occurred over the discharge.  Accordingly, in bankruptcy, the requirement of acceptance requires only some award of relief.

In the case at hand, the Court did not actually rely upon the misrepresentation in a ruling.  Prior to this motion, there has been no litigation in this case.  Nor has Angelo received a discharge.  Nonetheless, acceptance and reliance have occurred in two ways.  First, the Court relied on the fraudulent matrix in giving notice of the case, and information about the case, to creditors.  The notice, a standard form, puts creditors on notice of the bankruptcy filing and of related deadlines; it also informs them of the automatic stay (among other consequences of the bankruptcy filing) and, in doing so, helps avoid precisely the kinds of problems we have here.  As a consequence of the Angelo's omissions, Robinson did not receive the notice.  Second, acceptance occurred when, by operation of 11 U.S.C. § 362(a) ("a petition filed under section 301 . . . operates as a stay of . . . "), Angelo was granted the protection of the automatic stay.  That this occurred automatically, by simple operation of the filing

of the bankruptcy petition, is of no more moment than that, in chapter 7 cases, discharge enters by

default, without actual reliance.  In both instances, the discharge and the stay, relief enters on the

assumption that a debtor has been accurate and truthful in his or her dealings with the court.  This is

part of the quid pro quo of bankruptcy.  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110(1ˢᵗ Cir. 1987)

("[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his

willingness to make a full disclosure"); *JP Morgan Chase Bank, N.A. v. Koss (In re Koss)*, 403 B.R. 191, 212

(Bankr.D.Mass.2009) ("Requiring debtors to give an honest, conscious effort to prepare accurate,

detailed and complete schedules is . . . a reasonable quid pro quo" (internal quotations omitted)).

Especially here, where the protection of the stay is itself in issue, the reality of this relief can hardly be

denied.  For these reasons, the second requirement for judicial estoppel is established.

The third consideration in the analysis for judicial estoppel is unfair advantage, which is not a

necessity but, when present, serves as an intensifier.  "Where unfair advantage exists, . . . it is a

powerful factor in favor of allowing the doctrine."  *Guay v. Burack*, 677 F.3d at 16-17.  Angelo's failure to

schedule Robinson's debt helped create ambiguity about the status of the debt.  Almost invariably, the

failure to schedule a debt creates confusion about the status of the debt, about whether and how the

automatic stay and discharge affect the debt.  This confusion extends not only to creditors but also to

attorneys—especially those not steeped in bankruptcy practice, such as Peck, but sometimes even those

who are—and to state courts and beyond.[23]  Confusion of this kind clearly did arise here.  Angelo only

intensified it, when, through his attorney, he told Peck that the Robinson Award would be unaffected by

the bankruptcy filing.  He furthered the problem by not giving her and Peck notice of his conversion to

chapter 13, a move that had significant consequences for the breadth of what she and Peck were free to

do under § 362(b)(2)(B) and to the effect of any discharge he might receive on the parts of the Robinson

Award that are not domestic support obligations.  I do not suggest that this confusion excuses the

---

[23] To be clear, the automatic stay applies even to unscheduled debt, and a debtor's failure to schedule debt, even in bad faith, does not excuse the unlisted creditor from honoring the stay.

violation of the stay that did occur, but I do find that it played a significant role in bringing it about.  It

led Robinson and Peck into positions that Angelo now seeks to exploit and therefore removes any

hesitation I might otherwise have about the propriety of judicial estoppel.

In so ruling, I am mindful that courts must be vigilant in policing violations of the stay, and that

Angelo's transgressions are not justification for Robinson's and Peck's.  However, I am satisfied that,

insofar as chastisement may be required, Peck and Robinson have already been sufficiently chastised

and penalized by the cost, delay, and trauma occasioned by the present motion that no punitive

damages would in any event be warranted.[24]  Also, the estoppel here applies only to Angelo's motion for

damages, not to his demand for declaratory relief.   Nor do I rule that every instance of inaccuracy in a

debtor's schedules constitutes a defense to § 362(k)(1) damages.  Judicial estoppel is a matter of

discretion.  Angelo's case is egregious, a gross abuse of the bankruptcy laws, behavior the Court cannot

tolerate.  "[T]he integrity of the bankruptcy process is sufficiently important that we should not hesitate

to apply judicial estoppel even where it creates a windfall for an undeserving defendant."  *Guay v.

Burack*, 677 F.3d at 19, citing *Payless Wholesale Distributors*, 989 F.2d at 571.  There is no windfall here,

only the integrity of the process to defend.  For these reasons, Angelo is estopped from seeking

damages under § 362(k)(1).

**CONCLUSION**

For the reasons set forth above, the Court concludes that the Contempt Judgment is valid and

enforceable except to the extent that it would enforce Robinson's right to damages for her watch,

---

[24] I need not and do not address the propriety of damages, either actual or punitive, under § 362(k)(1) but merely
note that the case here for punitive damages is weak.   Robinson and Peck were in any event entitled to a judicial
determination of whether the automatic stay applied to the Contempt Complaint, and the Probate Court
addressed that issue as soon as it was raised, before proceeding to the merits.   Also, where Angelo is judicially
estopped from seeking damages, any punitive damages that I might assess to enforce the stay would not be
payable to him.

cookbook, and doll collections, for an unquantified portion of $6,400.00, and that Angelo is judicially

estopped from seeking damages under § 362(k)(1).  A separate order will enter accordingly.


Date:  September 27, 2012

_____
Frank J. Bailey
United States Bankruptcy Judge